PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America
By:   JEAN-DAVID BARNEA
      DAVID J. KENNEDY
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone (212) 637-2733/2679
Facsimile (212) 637-0033
jean-david.barnea@usdoj.gov
david.kennedy2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>      v.<br><br>JPMORGAN CHASE BANK, NA,<br><br>                      Defendant. | COMPLAINT<br><br>17 Civ. \_\_\_\_ (\_\_\_\_) |

       The United States of America (the "United States"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, files this Complaint, alleging as follows:

## INTRODUCTION

       1.     This action is brought by the United States to enforce the provisions of the Fair Housing Act, 42 U.S.C. §§ 3601-3619 ("FHA"), and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f ("ECOA").

       2.     As alleged more fully below, defendant JPMorgan Chase Bank, NA ("Chase") has engaged in a pattern or practice of discrimination on the basis of race or ethnicity in that,

from at least 2006 through late 2009, its African-American and Hispanic borrowers have paid higher rates and fees on "wholesale" home mortgage loans — *i.e.*, loans originated by mortgage brokers — compared to the rates and fees paid by Chase's similarly situated white borrowers. In thousands of instances, an African-American borrower with the same credit and risk profile as a white borrower, entering into the same type of Chase wholesale mortgage, paid higher loan rates and larger fees. Similarly, in thousands of instances, a Hispanic borrower with the same credit and risk profile as a white borrower, entering into the same type of Chase wholesale mortgage, paid higher loan rates and larger fees.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 3614, and 15 U.S.C. § 1691e(h).

4.     Venue is appropriate pursuant to 28 U.S.C. § 1391, because defendant conducts business in this district and a principal place of business is located in this district.

## PARTIES

5.     Plaintiff is the United States of America.

6.     Defendant JPMorgan Chase Bank, N.A., a subsidiary of JPMorgan Chase & Co., is a large consumer bank that conducts business in this district. Chase is one of the nation's largest residential mortgage lenders. In the relevant time period, Chase used mortgage brokers to originate large numbers of wholesale loans.

7.     From 2006 to 2009, Chase originated approximately 360,000 wholesale mortgage loans. Of these, Chase reported that approximately 40,000 wholesale loans were made to African-American borrowers and that approximately 66,000 wholesale loans were made to Hispanic borrowers.

8. Chase is subject to federal laws governing fair lending, including the FHA and the ECOA and the regulations promulgated under each of those laws. The FHA and the ECOA prohibit financial institutions from discriminating on the basis of, *inter alia*, race or ethnicity in their lending practices. Charging higher prices for loans on the basis of race or ethnicity, including charging higher fees and annual percentage rates of interest, is one of the discriminatory lending practices prohibited by the FHA and the ECOA.

9. Chase is a "creditor" within the meaning of the ECOA, 15 U.S.C. § 1691a(e), and engages in "residential real estate-related transactions" within the meaning of the FHA, 42 U.S.C. § 3605. Chase also is subject to the Home Mortgage Disclosure Act, 12 U.S.C. § 2803, which requires mortgage lenders to maintain data on the race or ethnicity of each borrower.

## FACTUAL ALLEGATIONS

**A. Background**

10. Beginning prior to January 2006 and continuing until late 2009, Chase originated residential mortgage loans through both a retail channel, through its nationwide branch network, and a wholesale channel, with a network of mortgage brokers located across the United States. Chase stopped originating wholesale loans in late 2009, but has continued to originate retail loans since that time.

11. Between 2006 and 2009, Chase charged African-American and Hispanic wholesale borrowers higher annual percentage rates ("APRs") — comprised of note rates, fees, and other costs — than non-Hispanic White wholesale borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin. It was Chase's business practice to allow mortgage brokers who generated loan applications through its wholesale channel to vary a loan's APR from the price initially set based

3

on a borrower's objective credit-related factors. This pricing discretion resulted in African-American and Hispanic borrowers paying more than non-Hispanic White borrowers, not based on borrower risk. As a result of Chase's discriminatory wholesale pricing practices, an African-American or Hispanic borrower paid, on average, approximately one thousand dollars more for a Chase wholesale loan than did a non-Hispanic White borrower. There is consequently a causal connection between Chase's wholesale pricing discretion policies and the disparities among borrowers based on race and national origin.

12. Chase's wholesale pricing monitoring efforts, while inadequate to remedy discriminatory practices against African-American and Hispanic borrowers between 2006 and 2009, were sufficient to put it on notice of widespread pricing disparities based on race and national origin. Even when Chase had reason to know there were disparities, however, Chase did not act to determine the full scope of these wholesale pricing disparities, nor did it take prompt and effective action to eliminate those disparities, nor did it engage in adequate efforts to remedy the impact of those disparities upon the borrowers. There is consequently a causal connection between Chase's wholesale pricing monitoring policies and the disparities among borrowers based on race and national origin.

**B.   Chase's Wholesale Lending Practices**

13. Prior to January 2006 and continuing until late 2009, Chase originated and funded residential mortgage loans through a wholesale channel. Applications for these loans were brought to Chase by thousands of mortgage brokers throughout the United States who had entered into contracts with Chase for the purpose of bringing mortgage loan applications to it for origination and funding.

14. Chase's relationship with the mortgage brokers who brought mortgage loans to it was governed throughout the time period at issue by its Loan Origination/Sale Agreement (the "Agreement"), which was amended over time. The Agreement from 2006 through 2009 consistently contained provisions detailing that Chase maintained ultimate control over all lending decisions, including pricing terms and conditions, for mortgage loans made through its wholesale channel. Chase was directly and extensively involved in setting the complete terms and conditions of wholesale mortgage loans.

15. Chase evaluated the risk of making each wholesale mortgage loan using Chase's underwriting guidelines and determined whether to originate and fund the loan. The Agreement provided that Chase "may, in its sole discretion, accept or reject any proposed Loan, based on applicable guidelines as interpreted by Chase."

16. Before January 2006 and continuing through late 2009, Chase set prices, including the interest rate and points, on a daily basis for its various wholesale home mortgage loan products based on the current market rates of interest and the price it would receive by selling loans to investors, plus a profit margin for Chase. These prices were communicated to its mortgage brokers through "rate sheets."

17. During that period, Chase's rate sheets for the broker channel also dictated the adjustments that would be made to the price on the rate sheet based on numerous objective credit characteristics of applicants. Chase rate sheets generally provided different note rates and fees based on borrowers' credit scores (with increased rates for lower credit scores), the percentage down-payment they made, the loan-to-value ratio, documentation type, and other loan characteristics. These pricing adjustments were intended to fully compensate Chase and the investors who bought its loans for differences in borrowers' credit risk.

18. By consulting the rate sheets, or computer systems that relied on the data contained in the rate sheets, Chase mortgage brokers determined the interest rate, fees, and points to quote individual mortgage loan applicants based on their objective credit characteristics. Individual loan applicants did not have access to the rate sheets or pricing adjustment worksheets, and could not apply for a wholesale mortgage loan from Chase except at the price quoted by their mortgage broker.

19. Under the Agreement, Chase delegated to mortgage brokers the task of informing prospective borrowers of the terms and conditions under which Chase wholesale mortgage loans were available. Chase did not require the mortgage brokers to inform a prospective borrower of the lowest price for which he qualified for a specific loan product.

20. Before January 2006 and continuing through late 2009, Chase gave its mortgage brokers discretion to deviate upward or downward from the loan price that was set based on the borrower's objective credit characteristics using the rate sheets. This step of pricing wholesale loans permitted mortgage brokers to exercise discretion in setting the final price Chase charged to individual borrowers, unrelated to a borrower's credit risk characteristics.

21. Mortgage brokers who supplied Chase with mortgage loan applications that Chase funded were compensated in two ways. One was through a yield spread premium ("YSP"), an amount paid by Chase to the brokers based on the extent to which the interest rate charged on a mortgage loan exceeded the rate, based on a borrowers' particular credit qualifications, set by the rate sheet. The second way brokers were compensated was through direct fees paid to brokers out of borrowers' funds, including loan proceeds at the loan closing.

22. Based on these two forms of compensation, Chase calculated the total compensation payable to the broker on each wholesale mortgage loan. Higher total compensation

raised the borrower's price for a loan, through a higher note interest rate, a higher final annual percentage rate charged on a loan, and/or a higher final total amount borrowed. Chase continued to allow mortgage brokers to charge YSPs and raise their compensation through pricing adjustments through late 2009.

23. The compensation Chase paid to the mortgage brokers was included, along with the note rate of the mortgage, in calculating the mortgage's APR as disclosed to the borrower.

24. During the time period at issue, Chase was fully informed of all broker compensation to be charged with respect to each individual residential loan application presented to it. The Agreement required brokers to disclose "any fee or other compensation in writing to both the applicant and Chase as required by applicable law."

25. The Agreement allowed Chase to control the charges it included in the terms of the loan for broker compensation. Chase exercised its right to control broker compensation, but it left wide discretion to mortgage brokers on the compensation charge that Chase included in the terms of the loan between at least January 2006 and late 2009. The Chase rate sheets specified maximum YSPs that brokers could charge borrowers depending on certain loan characteristics such as the presence or absence of a prepayment penalty.

26. Charging higher total APR on the basis of race and national origin, whether through Chase's inclusion of a higher YSP or higher direct broker fees in the price of the mortgage loan or otherwise, is a discriminatory lending practice by Chase prohibited by the FHA and the ECOA.

27. For each wholesale mortgage loan that Chase originated, information about each borrower's race and national origin and the amount and types of broker fees paid was available to, and was known by, Chase prior to the approval and funding of the loan. Chase was required

to collect, maintain, and report data with respect to significant mortgage loan terms and borrower information for residential loans, including the race and national origin of each wholesale home loan borrower, pursuant to HMDA.

### C. Chase's Failure to Adequately Address Wholesale Lending Disparities Based on Race and National Origin

28. Chase regularly monitored between 2006 and 2009 the race and national origin disparities that existed in the total compensation it charged on wholesale mortgage loans, and it knew or should have known that race and national origin disparities in the total compensation it charged existed throughout that period on the national level and in multiple regional markets. By failing to adequately address these disparities based on race and national origin, Chase continued to engage in lending discrimination.

29. Regression analyses of Chase wholesale pricing that control for credit-related factors such as credit score, loan amount, loan to value ratio, loan purpose, and other factors, demonstrate that the race and national origin disparities in pricing adjustments described herein produced race and national origin disparities in the APR charged by Chase between 2006 and 2009 to African-American and Hispanic wholesale borrowers that cannot be explained by credit risk factors. Conducting such regression analyses on APRs was necessary because Chase did not maintain accurate data on the fees paid by wholesale borrowers in this time period and thus was not able to provide such data to the Government; otherwise it would not be necessary to control for credit-related factors in analyzing differences in wholesale fees as they are not expected to vary with credit-related factors.

30. On average, between 2006 and 2009, Chase charged African-American borrowers whom Chase determined had the credit characteristics to qualify for a home mortgage loan more

in pricing adjustments not based on borrower risk for wholesale loans than non-Hispanic White borrowers. The average APR disparity was at least 11.907 basis points (a basis point is one one-hundredth of one percent), and it is statistically significant.

31. On average, between 2006 and 2009, Chase charged Hispanic borrowers whom Chase determined had the credit characteristics to qualify for a home mortgage loan more in pricing adjustments not based on borrower risk for wholesale loans than non-Hispanic White borrowers. The average APR disparity was at least 6.488 basis points, and it is statistically significant.

32. These APR disparities mean that, while the average loan size differs between African-Americans and Hispanics, Chase charged an African-American wholesale customer an average of about $1,126 more in fees and in higher note rate, on an average loan amount of $191,100, over the first five years of the loan not based on borrower risk, and a Hispanic wholesale customer an average of about $968 more, on an average loan amount of $236,800, than a non-Hispanic White borrower. As a consequence of Chase's business practices, therefore, at least 53,000 black and Hispanic borrowers from 2006 to 2009 sustained tens of millions of dollars in damages.

33. The statistically significant race and national origin disparities in APR described herein for African-American and Hispanic wholesale borrowers, whom Chase determined had the credit characteristics to qualify for a home mortgage loan, resulted from the implementation and the interaction of Chase's policies and practices that: (a) allowed discretion to mortgage brokers in setting pricing adjustments not based on borrower risk for wholesale loans, after the loan price had been established by reference to credit risk characteristics; (b) did not require mortgage brokers to justify or document the reasons for the amount of pricing adjustments not

based on borrower risk for wholesale loans; (c) failed to adequately monitor for and fully remedy the effects of race and national origin disparities in APR; and (d) created a financial incentive for mortgage brokers to charge interest rates above the interest rates Chase had set based on credit risk characteristics. Chase continued to permit these discretionary wholesale pricing policies to result in racially disparate APRs through late 2009.

34. Chase's policies and practices identified in the previous Paragraph were not justified by business necessity or legitimate business interests. There were less discriminatory alternatives available to Chase than these policies or practices. For example, Chase could have, but failed, to modify the discretion it allowed to mortgage brokers and how its compensation practices affected how that discretion is exercised. Similarly, Chase could have, but failed, to better monitor its wholesale brokers to discourage discrimination against borrowers based on race or national origin. There was no business necessity or legitimate business interest behind Chase's decision to allow its wholesale channel to engage in discrimination against borrowers based on race and national origin. Chase's failure to adequately address discrimination in its wholesale mortgage lending channel, moreover, encouraged discrimination to continue.

35. Chase had knowledge that the discretion it granted to mortgage brokers in its wholesale mortgage loan pricing policies and practices was being exercised in a manner that discriminated against African-American and Hispanic borrowers, but continued to implement its policies and practices with that knowledge. Chase did not take effective action before ending its wholesale lending practice in late 2009 to change the pricing adjustment policies or practices to fully eliminate their discriminatory impact, nor did it change its compensation policy to discourage the charging of higher pricing adjustments. It did not act to identify or compensate

the individual borrowers who were victims of its discriminatory wholesale mortgage loan pricing policies or practices.

## CLAIM FOR RELIEF

36. The United States respectfully incorporates paragraphs 1 through 35 of the Complaint as if fully incorporated herein.

37. Chase's actions, policies and practices, as alleged herein, constitute:

    a. Discrimination on the basis of race or ethnicity in making available, or in the terms or conditions of, residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a);

    b. Discrimination on the basis of race or ethnicity in the terms, conditions, or privileges of the provision of services in connection with sale of a dwelling, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b); and

    c. Discrimination against applicants with respect to credit transactions on the basis of race or ethnicity in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1).

38. Chase's actions, policies and practices, as alleged herein, constitute:

    a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f; and

    b. A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance.

39. Persons who have been victims of Chase's discriminatory actions, policies and practices are aggrieved persons as defined in the FHA, 42 U.S.C. § 3602(i), and aggrieved

applicants as defined in the ECOA, 15 U.S.C. § 1691e, and have suffered injury and damages as a result of Chase's violation of both the FHA and the ECOA.

40. Chase's pattern or practice of discrimination has been intentional and willful, and has been implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

## REQUEST FOR JUDGMENT

WHEREFORE, the United States requests that the Court enter a JUDGMENT that:

(a) Declares that the policies and practices of Chase constitute violations of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f;

(b) Enjoins Chase, its agents, employees, and successors, and all other persons in active concert or participation with Chase, from:

(i) Discriminating on the basis of race and national origin with respect to making available, or in the terms or conditions of, a residential real estate-related transaction;

(ii) Discriminating on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling;

(iii) Discriminating on the basis of race and national origin against any person with respect to any aspect of a credit transaction;

(iv) Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Chase's unlawful conduct to the position they would have been in but for the discriminatory conduct; and

(v) Failing or refusing to take such affirmative steps as may be necessary to eliminate, to the extent practicable, the effects of Chase's unlawful practices;

(c) Awards monetary damages to the victims of Chase's discriminatory policies and practices for the injuries caused by Chase, including direct economic costs, consequential economic damages, and other damages, pursuant to 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h);

(d) Assesses a civil penalty against Chase in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

3

    (e)    The United States further requests such additional relief as the interests of justice may require.

Dated:    New York, New York
             January 11, 2017

|  |  |
|---|---|
| VANITA GUPTA<br>Principal Deputy Assistant Attorney General<br>Civil Rights Division<br><br>SAMEENA SHINA MAJEED<br>Chief<br>Housing and Civil Enforcement Section<br>U.S. Department of Justice<br>Civil Rights Division<br>950 Pennsylvania Ave., NW - NWB<br>Washington, D.C. 20530 | LORETTA LYNCH<br>Attorney General<br><br>PREET BHARARA<br>United States Attorney for the<br>Southern District of New York<br>Attorney for the United States<br><br>By: _/s/_<br>JEAN-DAVID BARNEA<br>DAVID J. KENNEDY<br>Assistant United States Attorneys<br>86 Chambers Street, Third Floor<br>New York, N.Y. 10007<br>Telephone (212) 637-2733/2679<br>Facsimile (212) 637-0033<br>jean-david.barnea@usdoj.gov<br>david.kennedy2@usdoj.gov |